ORIGINAL

FILED

08 APR -3 PH 3:18

E-filing

1  Susan G. Kupfer (Bar No. 141724)
   Kathleen S. Rogers (Bar No. 122853)
2  GLANCY BINKOW & GOLDBERG LLP
   One Embarcadero Center, Suite 760
3  San Francisco, CA 94111
   Telephone: (415) 972-8160
4  Facsimile:  (415) 972-8166
   skupfer@glancylaw.com
5  krogers@glancylaw.com

6
   *Attorneys for Plaintiff and the Proposed Classes*
7
                  UNITED STATES DISTRICT COURT
8
                 NORTHERN DISTRICT OF CALIFORNIA          VRW
9

10
   DANA ROSS, on behalf of himself and all     CV  Case No.  08     1807
11 others similarly situated,

12                                              **CLASS ACTION COMPLAINT FOR
              Plaintiff,                        DAMAGES**
13
          vs.                                   <u>**JURY TRIAL DEMANDED**</u>
14
   CHUNGHWA PICTURE TUBES, LTD.; LP
15 DISPLAYS INTERNATIONAL, LTD;
   MATSUSHITA ELECTRIC INDUSTRIAL
16 CO., LTD.; MT PICTURE DISPLAY CO.,
   LTD.; KONINKLIJKE PHILIPS
17 ELECTRONICS NV; SAMSUNG SDI CO.;
   TOSHIBA CORP.; TOSHIBA AMERICA,
18 INC.,
              Defendants.
19

20
          Plaintiff Dana Ross, on behalf of himself and the classes defined below ("Plaintiff"), by
21
   his attorneys, brings this civil action for damages and injunctive relief against the above-named
22
   Defendants, and demanding a trial by jury, complains and alleges as follows:
23

24

25

                                                     CLASS ACTION COMPLAINT

1

## INTRODUCTION

2    1.    This case arises out of a long-running conspiracy extending from at least May 1,

3    1998 through November 9, 2007 (the "Class Period") among Defendants and their co-

4    conspirators, with the purpose and effect of fixing, raising, and/or maintaining the prices for

5    cathode ray tubes ("CRTs") sold indirectly to Plaintiff and other indirect purchasers in California

6    and throughout the United States.

7    2.    CRTs are used in a number of products, including but not limited to televisions

8    and computer monitors. Throughout the Class Period, Defendants' conspiracy was intended to,

9    and did, moderate the downward pressure on CRTs (and, as a result, products containing CRTs)

10    caused by the rapidly increasing popularity of flat panel products using liquid crystal displays

11    ("LCD") and plasma display panels ("PDP") (collectively, "FPD").

12    3.    Defendants and their co-conspirators formed an international cartel to illegally

13    restrict competition in the CRT market, targeting and severely burdening indirect purchasers in

14    California and throughout the United States. During the Class Period, Defendants' conspiracy

15    affected billions of dollars of commerce throughout the United States, including in California.

16    As a result of this conspiracy, Plaintiff and indirect purchasers have been injured in their

17    business and property by paying more for CRTs than they otherwise would have paid in the

18    absence of Defendants' conspiracy.

19    4.    Plaintiff brings this action seeking federal injunctive relief under Section 16 of the

20    Clayton Act, 15 U.S.C. §26, for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to

21    recover damages under state antitrust, consumer protection, unfair trade, and/or deceptive

22    practices laws, common law principles of restitution, disgorgement, unjust enrichment, as well as

23    to recover the costs of the suit, including reasonable attorney's fees, for the injuries that Plaintiff

24    and all others similarly situated sustained as a result of the Defendants' conspiracy to fix, raise,

25    maintain and stabilize the prices of CRTs.

1

## JURISDICTION AND VENUE

2      5.      Plaintiff brings this action under Sections 4, 12 and 16 of the Clayton Act (15

3   U.S.C. §§15, 22 and 26) for treble damages and injunctive relief, arising from violations by

4   Defendants of the antitrust laws, including Section 1 of the Sherman Antitrust Act (15 U.S.C.

5   §1).

6      6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and

7   1337(a).

8      7.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§15, 22 and 26, and

9   28 U.S.C. §§1391(b), (c) and (d) in that Defendants reside, transact business, are found and/or

10  have agents within this judicial district, and a substantial part of the events giving rise to

11  plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce

12  described below has been carried out in this district.

13     8.      Defendants conduct business throughout the United States, including this

14  jurisdiction, and they have purposefully availed themselves of the laws of the United States,

15  including specifically the laws of California, as alleged in this Complaint. Defendants' products

16  are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial

17  and reasonably foreseeable effect on such commerce.

18     9.      Defendants and their co-conspirators directly or through their agents engaged in

19  the activities alleged in this Complaint and substantially affected commerce in California and

20  throughout the United States. Defendants have purposefully availed themselves of the laws of

21  California in connection with their activities relating to the production, marketing, and/or sale of

22  CRTs. Defendants produced, promoted, sold, marketed, and/or distributed CRTs, thereby

23  purposefully profiting from access to indirect purchaser end-user businesses and consumers in

24  California. Defendants also contracted to supply or obtain goods or revenue related to the

25  business for CRTs. As a result of the activities described in this Complaint, Defendants:

CLASS ACTION COMPLAINT

- 3 -

1               a.    Caused damage to the residents of the state of California;

2               b.    Caused damage in California by acts or omissions committed outside

3                    California by regularly doing or soliciting business in the state;

4               c.    Engaged in persistent courses of conduct within California and/or derived

5                    substantial revenue from the marketing of CRTs or the products in which

6                    they are used in California (and services relating to such marketing); and

7               d.    Committed acts or omissions that they knew or should have known would

8                    cause damage (and did, in fact, cause such damage) in California while

9                    regularly doing or soliciting business in the state, engaging in other

10                  persistent courses of conduct in the state, and/or deriving substantial

11                  revenue from the marketing of CRTs or the products in which they are

12                  used in California.

13     10.    The conspiracy described in this Complaint affected adversely every person

14  nationwide and in California who indirectly bought Defendants' CRTs. Defendants' conspiracy

15  has resulted in an adverse monetary effect on indirect purchasers in California.

16     11.    Prices of CRTs in California can be manipulated by conspirators within the state,

17  outside of it, or both. If the antitrust and/or consumer protection laws of California are not

18  enforced, companies that break the law will go unpunished. Defendants knew that commerce in

19  California would be adversely affected by implementing their conspiracy.

20                       **INTRADISTRICT ASSIGNMENT**

21     12.    As indicated on the Civil Cover Sheet accompanying this Complaint, related

22  multi-district litigation ("MDL") is pending in this Court before the Honorable Samuel Conti,

23  3:07-cv-05944-SC, *In re Cathode Ray Tube (CRT) Antitrust Litigation.* The Defendants, the

24  industry, the geography and the basic allegations of the conspiracy alleged in this Complaint

25

1   substantially overlap the allegations in the complaints already consolidated before the Honorable

2   Samuel Conti in 3:07-cv-05944-SC.

3                                        **PARTIES**

4   **A.    Plaintiff**

5          13.    Plaintiff Dana Ross is a resident of Ventura County, California.  During the Class

6   Period, he indirectly purchased a CRT from one or more Defendants, and was injured as a result

7   of Defendants' illegal conduct.

8   **B.    Defendants**

9          14.    Defendant Chunghwa Picture Tubes Ltd. is a Taiwanese business entity with its

10  principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan, 334.  During

11  the Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to

12  customers throughout the United States.

13         15.    Defendant LP Displays International, Ltd., f/k/a LG Philips Displays, Ltd., is a

14  Hong Kong business entity with its principal place of business at 6th Floor, ING Tower, 308 Des

15  Voeux Central, Sheun Wan, Hong Kong.  During the Class Period, said Defendant

16  manufactured, marketed, sold and/or distributed CRTs to customers throughout the United States

17         16.    Defendant Matsushita Electric Industrial Co., Ltd. (d/b/a "Panasonic") is a

18  Japanese business entity with its principal place of business at 1006, Kadoma, Kadoma City,

19  Osaka 571-8501, Japan.  During the Class Period, said Defendant manufactured, marketed, sold

20  and/or distributed CRTs to customers throughout the United States.

21         17.    Defendant MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture

22  Display Co.) is a wholly-owned subsidiary of Matsushita Electric Industrial Co., Ltd., with its

23  principal place of business located at Takatsuki-shi, Osaka, Japan.  MT Picture Display Co. was

24  formerly owned and controlled by both Defendants Matsushita and Toshiba Corp. until early

25  2007, when Toshiba Corp. sold its share of the business. During the Class Period, MT Picture

1  Display Co., Ltd. manufactured, marketed, sold and/or distributed CRTs to customers throughout
2  the United States.

3      18.     Defendant Koninklijke (Royal) Philips Electronics NV is a Dutch business entity,
4  with its principal place of business at Breitner Cetner, Amselplein 2, 1096 BC Amsterdam, The
5  Netherlands. During the Class Period, said Defendant manufactured, marketed, sold and/or
6  distributed CRTs to customers throughout the United States.

7      19.     Defendant Samsung SDI Co. is a South Korean business entity with its principal
8  place of business at 575 Shin-dong, Youngtong-gu, Suwon, Kyongi, South Korea. During the
9  Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to customers
10 throughout the United States.

11     20.     Defendant Toshiba Corp. is a Japanese business entity with its principal place of
12 business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the
13 Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to customers
14 throughout the United States.

15     21.     Defendant Toshiba America, Inc. is a wholly-owned subsidiary of Toshiba Corp.,
16 and has its principal place of business at 1251 Avenue of the Americas, New York, NY. During
17 the Class Period, said Defendant manufactured, marketed, sold and/or distributed CRTs to
18 customers throughout the United States.

19

20 **C.    Co-Conspirators**

21     22.     Various persons and entities, whose identities are at this time unknown to
22 plaintiffs, participated as co-conspirators in the violations alleged in this Complaint and
23 performed acts and made statements in furtherance of said violations. When Plaintiff learns the
24 identities of such co-conspirators, he will seek leave to amend this Complaint to add such co-
25 conspirators as defendants.

1    23.    The acts charged in this Complaint have been done by Defendants and their co-
2    conspirators, or were authorized, ordered, or done by their respective officers, agents, employees,
3    or representatives while actively engaged in the management of each Defendant's business or
4    affairs.

5    24.    Each of the Defendants named in this Complaint acted as the agent or joint
6    venturer of or for the other Defendants with respect to the acts, violations and common course of
7    conduct alleged.  Each Defendant that is a subsidiary of a foreign parent acts as the United States
8    agent for CRTs made by its parent company.

9                                    **FACTUAL ALLEGATIONS**

10   **A.    CRT Technology**

11   25.    CRT is a widely used technology utilized in products such as televisions and
12   computer monitors that allow devices to display images upon the screen.

13   26.    Known for their brightness, resolution, rich colors, contrast, and reliability, CRTs
14   evolved from early black and white television sets and monitors to today's high-resolution,
15   digital-ready graphic models.  The basic components of a CRT are (a) a heated, cylindrical
16   cathode, or electron gun, that emits a steady stream of electrons; (b) a shadow mask that directs
17   the electron beams; (c) a phosphor-coated screen that absorbs the beams; (d) a deflection yoke
18   that directs the scanning electron beam, which strikes the screen to produce light; and (e) an
19   evacuated glass envelope that allows the entire process to take place in a vacuum.

20   27.    CRTs are manufactured in several standard sizes, including 17 inch, 19 inch, 23
21   inch, and 27 inch.  They are commodity products; those manufactured by Defendants are
22   interchangeable.

23   **B.    The CRT Market**

24   28.    CRTs have no independent utility, and have value only as components of other
25   products, primarily televisions and computer monitors.  Direct purchasers buy CRTs in order to

1  include them as components in televisions and computer monitors. The demand for CRTs thus
2  directly derives from the demand for such products.

3      29.    The market for CRTs and the market for the products into which they are placed
4  are inextricably linked and intertwined because the CRT market exists to serve the CRT products
5  markets. The market for CRTs and the markets for the products in which CRTs are placed are,
6  for all intents and purposes, inseparable in that one would not exist without the other.

7      30.    The largest direct purchasers of CRTs are television and computer Original
8  Equipment Manufacturers ("OEMs"). Significantly, some of the Defendants are (or were, during
9  the Class Period) also CRT television and/or computer OEMs, such as Toshiba Corp. and
10  Samsung SDI and/or its parent corporation.

11      31.    Plaintiff and the members of the classes defined below have participated in the
12  market for CRTs through their purchases of products containing CRTs. To the extent Plaintiff
13  and these indirect purchasers bought CRTs as part of a television or computer monitor,
14  Defendants' unlawful conspiracy inflated the prices at which OEMs resold such products.

15      32.    The market for CRTs in the United States is and remains extremely large. In
16  1997, the worldwide CRT market exceeded $24 billion. In 2006, industry experts estimated that
17  televisions containing CRTs made up at least half of all the projected 29 million televisions
18  shipped to North America that year.

19      33.    Nonetheless, while CRTs were once the dominant display screen technology used
20  in television and computer monitors, the market for CRT televisions and computer screens has
21  been in decline during the Class Period, due to the increased demand for FPD Products which are
22  used in the place of CRT models.

23      34.    FPD Products such as televisions and computer monitors first began competing
24  with the CRT models in the 1990s. By 1998, FPD products had taken over 32% of the market
25  for televisions and computer monitors.

- 8 -

CLASS ACTION COMPLAINT

35. While priced much higher than televisions and computer screens using CRTs, FPDs offered benefits to businesses and consumers unavailable in CRT models. Televisions using FPD technology offer smaller dimensions, increased aperture ratios, higher brightness, and lower power consumption. Computers using FPD technology offer greater mobility due to their smaller size, and lower power consumption.

36. Despite the large difference in price between televisions and computer screens using CRTs and those using FPD technology, throughout the Class Period, the percentage of televisions and computer screens purchased in the United States using FPD technology increased dramatically, while the percentage of those utilizing CRTs fell.

37. CRT televisions currently account for only 37% of television set revenues in the United States. Industry experts have predicted that by 2008, CRT screen shipments will constitute only 23% of the total television shipments in North America, while LCD screen shipments will comprise over 50% of the total shipments.

## C.  Structural Features of the CRT Industry

38. The CRT industry is characterized by a number of structural features that facilitate collusion.

39. First, there is significant market concentration. The increase in the popularity of FPD products caused many CRT manufacturers to exit the market during the Class Period. This caused increased consolidation and concentration in the CRT manufacturing industry.

40. During the Class Period, the Defendants collectively owned the majority of the market share for CRTs used in televisions and computer monitors.

41. Defendant Samsung SDI is currently the largest manufacturer of products containing CRTs. In 2004, it held (approximately) a 30% share of the global CRT market.

42. Defendant LP Displays currently has the second largest share of the global CRT market. In 2004, it held (approximately) a 27% share of the global CRT market.

CLASS ACTION COMPLAINT

1   43.   Defendant MT Picture Display held (approximately) a 9% share of the global
2   CRT market in 2004.

3   44.   Defendant Chunghwa Picture Tubes held (approximately) a 9% share of the
4   global CRT market in 2004.

5   45.   There are also significant barriers to entry in the CRT industry in the form of high
6   manufacturing and technological barriers to entry. Construction and maintenance of fabrication
7   plants is extremely expensive. Because of increased competition and ongoing technological
8   advances, manufacturers' research and development expenses are also extremely high.

9   46.   There are also multiple interrelated business relationships in the CRT industry.
10   For example, in November 2000, Defendants LG Electronics and Koninklijke Philips Electronics
11   agreed to enter into a joint venture that combined their CRT manufacturing operations. The
12   resulting company (LG Philips Displays, now known as LP Displays) entered the market with a
13   25% share in the global CRT market.

14   47.   Defendants Matsushita Electric Industrial Co., Ltd. and Toshiba Corporation also
15   entered into a joint venture combining their CRT manufacturing operations during the Class
16   Period. The resulting company (MT Picture Display Co.) immediately enjoyed a significant
17   share of the global CRT market.

18   48.   In 2005, Defendants Samsung SDI and LG Philips Displays entered into an
19   agreement to work together by sharing parts with respect to CRTs.

20   **D.   The Defendants' Illegal Conspiracy**

21   49.   The price of CRTs during the Class Period did not fully reflect the sharp decline
22   in demand for CRTs caused by the entry of the new generation of competing technologies.
23   Despite the introduction of technologically superior and increasingly popular alternatives to
24   televisions and monitors using CRTs, the price of CRTs remained unnaturally high throughout
25   the Class Period, with periods of sustained and unnatural price stability.

CLASS ACTION COMPLAINT

- 10 -

1    50.    The concentration of CRT manufacturers, the declining CRT share of the total

2    market for television and computer screens, and the higher price of FPD Products gave

3    Defendants the means and incentive to conspire and collude to artificially fix, maintain, and/or

4    stabilize the prices at which CRTs were sold.

5    51.    During the Class Period, Defendants and their co-conspirators agreed, combined,

6    and conspired to raise, maintain, and stabilize the prices at which CRTs were sold directly and

7    indirectly in the United States at artificial levels.  This illegal combination was effectuated by

8    means of illegal contracts, agreements, or secret negotiations between Defendants through their

9    officers, directors, and employees.

10    52.    For example, despite falling demand and increased use of FPD technology in

11    televisions and computer monitors, Defendants increased the prices of CRTs sold in February of

12    2002 and at other points of time throughout the Class Period.  This price increase was the result

13    of an agreement among Defendants to collectively raise the prices of CRTs.

14    53.    Defendants also agreed to fix, maintain, and/or stabilize the price of CRTs by

15    collectively agreeing to reduce the production of CRTs through plant closures and work

16    slowdowns.

17    54.    This conspiracy resulted in unnaturally higher prices for CRTs which were

18    fundamentally inconsistent with the low demand for them and their rapidly approaching

19    obsolescence.

20    **E.    International Antitrust Investigations**

21    55.    On or about November 8, 2007, government agencies from Japan, South Korea,

22    the European Union and the United States each opened coordinated investigations into CRT

23    manufacturers based on suspicions that Defendants formed an international price cartel to fix the

24    prices for CRTs.

25

CLASS ACTION COMPLAINT

- 11 -

56.    On or about November 8, 2007, new reports stated that CRT manufacturers were "suspected of holding meetings to discuss the price targets in Southeast Asian countries where CRT manufacturing bases are located." Another stated that "[t]he CRT manufacturers are suspected of operating an international cartel since 2005 or earlier."

57.    On or about November 8, 2007, Defendant Matsushita Electric Industrial Company confirmed that Japan's Fair Trade Commission raided MT Picture Display Co. as part of this international price-fixing investigation. Akira Dadota, a spokesman for Matsushita, admitted that Japan's Fair Trade Commission conducted an on-site inspection of MT Picture Display Company's offices in Japan. Up until early 2007, MT Picture Display Company was co-owned by Defendant Toshiba Corporation and Defendant Matsushita Electric Industrial Company.

58.    On or about November 8, 2007, Defendant Samsung SDI confirmed that South Korea's Fair Trade Commission launched a probe into Samsung SDI as part of this international price-fixing investigation.

59.    On or about November 8, 2007, news reports stated that Defendant LP Displays was visited by antitrust regulators as part of this international price-fixing investigation.

60.    On or about November 12, 2007, Defendant Chunghwa Picture Tubes admitted that the company had received a summons from the United States Department of Justice ("DOJ") as part of this international price-fixing investigation.

61.    On or about November 21, 2007, Defendant Royal Phillips Electronics admitted that the company is subject to this international price-fixing investigation.

**F.    The Pass-Through Of Overcharges To End-Users**

62.    OEMs and retailers of televisions and monitors containing CRTs are all subject to vigorous price competition. Televisions and computers are commodities, with little or no brand loyalty, such that aggressive pricing causes businesses and consumers to switch preferences to

1   different brands. Television and computer prices are closely based on production costs, which
2   are in turn directly determined by component costs, as assembly costs are minimal. OEMs
3   accordingly use component costs, like the cost of CRTs, as the starting point for all price
4   calculations. Television and computer monitor prices thus closely track increases and decreases
5   in component costs.

6   63.   Defendants' conspiracy to raise, fix, or maintain the price of CRTs at artificial
7   levels resulted in harm to Plaintiff and the indirect-purchaser classes because it resulted in them
8   paying higher prices for televisions and monitors containing CRTs than they would have in the
9   absence of Defendants' conspiracy. The entire overcharge for CRTs at issue was passed on the
10   Plaintiff and members of the indirect-purchaser class.

11   64.   An increase in the cost of purchasing a CRT significantly affects the price of
12   television or computer monitors using CRTs.

13   65.   CRTs account for a significant percentage of the overall cost of a television or
14   computer monitor. For example, CRTs account for approximately thirty (30) percent of the cost
15   of manufacturing a television set.

16   66.   CRTs are commodity products, with functionally equivalent products available
17   from the Defendants, which manufacture them pursuant to standard specifications and sizes.

18   67.   Because OEMs and retailers have thin net margins, they must pass on any
19   increase in component costs, such that increases in the price of CRTs lead to quick
20   corresponding price increases at the OEM and retail level for products containing CRTs.

21   68.   Thus, all supracompetitive overcharges are always passed through to the indirect-
22   purchaser, end-user plaintiff class members, who pay more for televisions and monitors
23   containing CRTs than in a competitive market place.

24

25

1    **G.    The Effect Of The Price Of CRTs On The Price Of Products**

2        69.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as

3    it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do

4    not change form or become an indistinguishable part of televisions or computer monitors.

5        70.    Thus, CRTs follow a traceable physical chain from the Defendants to the OEMs

6    to the purchasers of the finished products incorporating the CRT.

7        71.    Moreover, just as CRTs can be physically traced through the supply chain, so can

8    their price be traced to show that changes in the prices paid by direct purchasers of CRTs affect

9    prices paid by indirect purchasers of televisions and monitors containing CRTs.

10        72.    Because Defendants control the market for CRTs, there are virtually no choices

11    for persons and businesses that require products containing CRTs other than buying such

12    products manufactured by a direct purchaser that paid supracompetitive prices for CRTs to

13    Defendants because of Defendants' conspiracy alleged in this Complaint.

14        73.    When distribution markets are highly competitive, as they are in the case of

15    televisions and monitors containing CRTs, all of the overcharge will be passed through to

16    ultimate end-user businesses and consumers, such as the Plaintiff and members of the indirect-

17    purchaser classes.  In addition, most of the Defendants themselves manufacture, market, and

18    distribute televisions and monitors containing CRTs.  This means that these Defendants will pass

19    on through to their customers 100% of the supracompetitive price increases that result from the

20    Defendants' conspiracy, combination, and agreement to fix, increase, and stabilize the prices for

21    CRTs.

22        74.    Hence, the inflated prices of televisions and monitors containing CRTs resulting

23    from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other class

24    members by direct purchasers.

25

1    75.    During the Class Period, a number of large OEMs sold televisions and monitors

2    containing CRTs directly to end-buyers.  For example, the OEM with the largest share of

3    computer monitor sales in the United States market, Dell, sold exclusively to end-buyers, as did

4    Gateway.  During the Class Period, Compaq and Apple also sold large portions of their computer

5    monitors directly to the end-buyer.

6    76.    Computer models sold by other OEMs to retailers were generally updated several

7    times a year, and the price was changed for each new model.  For example, for one large retailer,

8    more than 90 percent of the computers sold during 2000 were either new models or were sold at

9    a different price from the price in the previous month.  OEMs, retailers and distributors often use

10   a "standard markup" method to set prices, meaning that they add a standard percentage to their

11   own costs to determine selling prices.  Thus, changes in the price of CRTs were passed on

12   rapidly rather than absorbed.

13   77.    In retailing, it is common to use a "markup rule."  The retail price is set as the

14   wholesale cost plus a percentage markup designed to recover non-product costs and to provide a

15   profit.  This system guarantees that increases in costs to the retailer will be passed on to end

16   buyers.  For example, CDW, a large seller of computer monitors, uses such a system, and a

17   declaration in the DRAM case from CDW's director of pricing details exactly how they

18   calculated selling prices:

19        In general, CDW employs a "building block" approach to setting its advertised
          prices.  The first building block is the Cost of Goods Sold (COGS), which
20        represents the price CDW paid to acquire the product... CDW... adds a series of
          positive markups to the cost to CDW to acquire a given product.  These markups
21        are in addition to the pass through effect of changes in the costs charged to CDW
          for that product by a given vendor.
22

23   78.    The economic and legal literature has recognized that unlawful overcharges in a

24   component normally result in higher prices for products containing that price-fixed component.

25   As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL

     ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 564:

1

2

3

4

5

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

6

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

7

8

9

10

11

12

79.     Similarly, two other antitrust scholars- Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)- have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

13

14

15

16

17

80.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

18

19

20

21

22

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

23

24

25

81.     The purpose of the conspiratorial conduct of the Defendants was to raise, fix or stabilize the price of CRTs and, as a direct and foreseeable result, televisions and monitors containing CRTs. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when

CLASS ACTION COMPLAINT

- 16 -

1   changes in dependent variable are explained by changes in a multitude of variables- when all
2   such variables may be changing simultaneously. That analysis- called regression analysis- is
3   commonly used in the real world and in litigation to determine the impact of a price increase on
4   one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate
5   and identify only the impact of an increase in the price of CRTs on prices for televisions and
6   monitors containing CRTs even through such products contain a number of other components
7   whose prices may be changing over time. A regression model can explain how variation in the
8   price of CRTs affects changes in the price of televisions and monitors containing CRTs. In such
9   models, rather than being treated as the dependent variable, the price of CRTs is treated as an
10  independent or explanatory variable. The model can isolate how changes in the price of CRTs
11  impact the price of televisions and monitors containing such CRTs while controlling for the
12  impact of other price-determining factors.

13      82.     Economic and legal literature recognized that the more pricing decisions are
14  based on cost, the easier it is to determine the pass-through rate. The directness of affected costs
15  refers to whether an overcharge affects a direct (*i.e.* variable) cost or an indirect (*i.e.* overhead)
16  cost. Overcharges will be passed-through sooner and at a higher rate if the overcharge affects
17  direct costs. Here CRTs are a direct (and substantial) cost of products containing CRTs.

18      83.     Other factors that lead to the pass-through of overcharges include: (i) whether
19  price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether
20  pricing decisions are based on cost; (iv) whether the overcharge affects variable, as opposed to
21  overhead, costs; (v) whether the resellers' production technology is uniform; (vi) whether the
22  reseller supply curve exhibits a high degree of elasticity; and (vii) whether the demand of the
23  resellers is inelastic. All of these factors were present in the CRT market during the Class
24  Period. The precise amount of such an impact on the prices of products containing CRTs can be
25  measured and quantified. Commonly-used and well-accepted economic models can be used to

CLASS ACTION COMPLAINT

1  measure both the extent and the amount of the supracompetitive charge passed-through the chain

2  of distribution.

3      84.    Plaintiff and other indirect purchasers have been forced to pay supracompetitive

4  prices for televisions and monitors containing CRTs. These inflated prices have been passed on

5  to them by direct purchaser manufacturers, distributors, and retailers. Those overcharges have

6  unjustly enriched Defendants.

7                          **CLASS ACTION ALLEGATIONS**

8      85.    Plaintiff brings this action on his own behalf and as a class action pursuant to

9  Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class

10  (the "Nationwide Class"):

11          All persons and entities residing in the United States which, from January 1, 1998
            through and including November 9, 2007, indirectly purchased in the United
12          States, for their own use and not for resale, a CRT which was manufactured
            and/or sold by one or more of the Defendants. Specifically excluded from this
13          Class are the Defendants; the officers, directors, or employees of any Defendant;
            any entity in which any Defendant has a controlling interest; and any affiliate,
14          legal representative, heir or assign of any Defendant. Also excluded are any
            judicial officer presiding over this action and the members of his/her immediate
15          family and judicial staff, and any juror assigned to this action.

16      86.    Plaintiff also brings this action on his own behalf and as a class action pursuant to

17  Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

18  members of the following class or subclass (the "California Indirect Purchaser Class"):

19          **CALIFORNIA:** All persons and entities in California who indirectly

20          purchased CRTs manufactured and/or sold by one or more of the

21          Defendants during the Class Period for their end use and not for resale.

22          Specifically excluded from this Class are the Defendants; the officers,

23          directors, or employees of any Defendant; any entity in which any

24          Defendant has a controlling interest; and any affiliate, legal representative,

25          heir or assign of any Defendant. Also excluded are any judicial officer

CLASS ACTION COMPLAINT

1

2

presiding over this action and the members of his/her immediate family

and judicial staff, and any juror assigned to this action.

3

4

5

6

7

87.    Plaintiff does not know the exact size of the classes at the present time. However, Plaintiff believes that due to the nature of the trade and commerce involved, there are at least thousands in the California Indirect Purchaser Class, and hundreds of thousands of class members geographically dispersed throughout the United States in the Nationwide Class, such that joinder of all class members would be impracticable.

8

9

10

11

88.    Plaintiff's claims are typical of the claims of the classes, and Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the classes. Plaintiff has retained competent counsel experienced in class action and complex antitrust and consumer protection litigation.

12

89.    Common questions of law and fact exist, including:

13

14

15

16

a.    Whether Defendants and their Co-Conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize the prices of, or allocate the market for CRTs sold in the United States;

17

18

b.    The duration and extent of the contract, combination, or conspiracy;

19

20

c.    Whether the Defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged in this Complaint;

21

22

d.    Whether Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

23

24

e.    Whether Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves,

25

- 19 -

1    express or implied, to fix, raise, maintain, or stabilize prices of CRTs sold

2    in and/or distributed in the United States;

3       f.   Whether the Defendants and their co-conspirators engaged in conduct in

4       violation of the antitrust, consumer protection, unfair trade, and/or

5       deceptive trade practices laws of California as alleged below;

6       g.   Whether the anticompetitive conduct of the Defendants and their co-

7       conspirators caused prices of CRTs to be artificially inflated to non-

8       competitive levels;

9

10       h.   Whether the Defendants and their co-conspirators unjustly enriched

11       themselves as a result of their inequitable conduct at the expense of the

12       members of the Classes;

13       i.   Whether Defendants and their co-conspirators fraudulently concealed the

14       existence of their unlawful conduct;

15       j.   Whether Plaintiff and the classes are entitled to injunctive relief; and

16       k.   Whether Plaintiff and other members of the classes were injured by the

17       conduct of Defendants and, if so, the appropriate measure of damages for

18       each of the classes.

19    90.    These and other questions of law and fact are common to the classes and

20    predominate over any questions affecting only individual class members, including legal and

21    factual issues relating to liability, damages, and restitution.

22    91.    Class action treatment is a superior method for the fair and efficient adjudication

23    of this controversy because:

24       a.   It will avoid a multiplicity of suits and consequent burden on the courts

25       and Defendants;

CLASS ACTION COMPLAINT

b.  It would be virtually impossible for all members of the classes to intervene as parties-plaintiff in this action;

c.  It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.  It is appropriate for treatment on a fluid recovery basis, which obviates any manageability problems; and

e.  It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

92.  This case is also appropriate for certification as a class action because the Defendants have acted and refused to act on grounds generally applicable to the classes, so that final injunctive relief will be appropriate with respect to the classes as a whole.

93.  The claims asserted in this Complaint are also appropriate for class certification under each of the states under which claims are asserted.

## FRAUDULENT CONCEALMENT

94.  Plaintiff and the members of the classes did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged in this Complaint until November 9, 2007, when the investigations by the DOJ and other antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff and the members of the classes were unaware of Defendants' unlawful conduct and did not know that they were paying artificially high prices for CRTs and the products in which they were used.

1      95.    The affirmative acts of the Defendants, including acts in furtherance of the

2  conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

3      96.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

4  concealing. As alleged above, Defendants had secret discussions about price and output.

5  Defendants agreed not to publicly discuss the existence or the nature of their agreement.

6      97.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

7  of any statute of limitations has been tolled with respect to any claims that Plaintiff and the

8  members of the classes have as a result of the anticompetitive conduct alleged in this Complaint.

9
## VIOLATIONS ALLEGED

10
## FIRST CLAIM FOR RELIEF

11
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

12     98.    Plaintiff incorporates by reference the preceding allegations of this Complaint as

13  if fully set forth.

14     99.    Beginning at a time currently unknown to Plaintiff, but at least as early as January

15  1, 1998 and continuing through November of 2007, the exact dates being unknown to Plaintiff,

16  Defendants and their co-conspirators entered into a continuing agreement, understanding, and

17  conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for CRTs and

18  televisions and monitors using CRTs sold in the United States, in violation of Section 1 of the

19  Sherman Act (15 U.S.C. §1).

20     100.    In formulating and carrying out the alleged agreement, understanding, and

21  conspiracy, the Defendants and their co-conspirators did those things that they combined and

22  conspired to do, including but not limited to the acts, practices, and course of conduct set forth

23  above, and the following, among others:

24         a.    Fixing, raising, stabilizing, and pegging the price of CRTs; and

25

b.      Allocating amongst themselves and collusively reducing the production of

CRTs.

101.    The combination and conspiracy alleged in this Complaint has had the following

effects, among others:

a.      Price competition in the sale of CRTs has been restrained, suppressed,

and/or eliminated throughout the United States;

b.      Prices for CRTs sold by Defendants have been raised, fixed, maintained

and stabilized at artificially high and non-competitive levels throughout

the United States; and

c.      Those that purchased CRTs directly or indirectly from Defendants and

their co-conspirators have been deprived of the benefits of free and open

competition.

102.    Plaintiff and the Nationwide Class members have been injured and will continue

to be injured in their businesses and property by paying more for CRTs purchased indirectly

from the Defendants and their co-conspirators than they would have paid and will pay in the

absence of the combination and conspiracy, including paying more for televisions and monitors

in which CRTs are included, as a result of higher prices paid for CRTs by the direct purchasers

of CRTs.

103.    Plaintiff and the Nationwide Class members are entitled to an injunction against

Defendants, preventing and restraining the violations alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment and Disgorgement of Profits

104.    Plaintiff incorporates by reference the preceding allegations of this Complaint as

if fully set forth.

1    105.    Defendants have been unjustly enriched through overpayments by Plaintiff and

2    the members of the Nationwide Class and the resulting profits.

3    106.    Under principles of unjust enrichment which exist in every state, Defendants

4    should not be permitted to retain the benefits conferred via overpayments by Plaintiff and the

5    members of the Nationwide Class.

6    107.    Plaintiff and all members of the Nationwide Class seek disgorgement of all profits

7    resulting from such overpayments and establishment of a constructive trust from which Plaintiff

8    and members of the Nationwide Class may seek restitution.

9    **THIRD CLAIM FOR RELIEF**

10    **Violation of California Antitrust Laws**

11    108.    Plaintiff incorporates by reference the preceding allegations of this Complaint as

12    if fully set forth.

13    109.    Defendants' intentional and purposeful anti-competitive acts that are described

14    above, including but not limited to acts of collusion to set prices and the actual act of price-fixing

15    itself, was intended to and did cause Plaintiff and the other members of the California Indirect

16    Purchaser Class to pay supra-competitive prices for consumer products containing CRTs

17    purchased in California.

18    110.    Defendants' monopolistic and anti-competitive acts as described above violate the

19    California Business and Professions Code §16720, *et seq.*

20    111.    Plaintiff and the California Indirect Purchaser Class seek actual damages for their

21    injuries caused by these violations in amount to be determined at trial.

22    112.    Plaintiff and the California Indirect Purchaser Class further seek treble damages

23    and attorneys' fees pursuant to California's antitrust laws as stated above to the extent allowed

24    by law.

25

CLASS ACTION COMPLAINT

1    113.    Plaintiff and the California Indirect Purchaser Class further seek attorneys' fees

2    and costs pursuant to California's antitrust laws as stated above to the extent allowed by law, due

3    to Defendants' willful and unlawful conduct as alleged above.

4    ## FOURTH CLAIM FOR RELIEF

5    ### Violation of California Unfair Competition Law

6    114.    Plaintiff incorporates by reference the preceding allegations of this Complaint as

7    if fully set forth.

8    115.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

9    fraudulent acts or practices in violation of California Business & Professions Code §17200, *et*

10   *seq.*

11   116.    Plaintiff and the California Indirect Purchaser Class seek restitution and

12   disgorgement of Defendants' unlawfully obtained profits for their injuries caused by these

13   violations, in an amount to be determined at trial.

14   117.    Plaintiff and the California Indirect Purchaser Class seek attorneys' fees due to

15   Defendants' willful and unlawful conduct where allowable by law.

16   ## PRAYER FOR RELIEF

17   WHEREFORE, Plaintiff prays as follows:

18   A.    That the Court determine that the Sherman Act, California antitrust law, and

19   California unfair competition law claims alleged in this Complaint may be maintained as class

20   actions under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, as informed

21   by California's class action laws;

22   B.    That the unlawful conduct, contract, conspiracy or combination alleged in this

23   Complaint be adjudged and decreed to be:

24        1.    A restraint of trade or commerce in violation of Section 1 of the Sherman

25              Act, as alleged in the First Claim for Relief;

CLASS ACTION COMPLAINT

- 25 -

1

2.       Acts of unjust enrichment as set forth in the Second Claim for Relief;

2

3.       An unlawful combination, trust, agreement, understanding, and/or concert

3

of action in violation of California's antitrust laws identified in the Third

4

Claim for Relief; and

5

4.       A violation of the California Unfair Competition Law as alleged in the

6

Fourth Claim for Relief.

7

C.       On the First Claim for Relief, that Defendants, their affiliates, successors,

8

transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all

9

other persons acting or claiming to act on their behalf or in concert with them, be permanently

10

enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct,

11

contract, conspiracy or combination alleged in this Complaint, or from entering into any other

12

contract, conspiracy or combination having a similar purpose or effect, and from adopting or

13

following any practice, plan, program, or device having a similar purpose or effect;

14

D.       On the Second Claim for Relief, that Plaintiff and the members of the Nationwide

15

Class recover the amounts by which the Defendants have been unjustly enriched as a result of

16

their unlawful conduct;

17

E.       On the Third Claim for Relief, that Plaintiff and the members of the California

18

Indirect Purchaser Class recover damages, to the maximum extent allowed under California's

19

antitrust laws set forth above, and that a joint and several judgment in favor of Plaintiff and the

20

California Indirect Purchaser Class be entered against the Defendants in an amount to be trebled

21

to the extent permitted by such laws;

22

F.       On the Fourth Claim for Relief, that Plaintiff and the members of the California

23

Indirect Purchaser Class be awarded restitution, including disgorgement of profits obtained by

24

Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

25

G. That Plaintiff and members of each of the classes defined in this Complaint be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

H. That Plaintiff and members of each of the classes defined in this Complaint recover their costs of suit, including a reasonable attorney's fee, as provided by law; and

I. That Plaintiff and members of each of the classes defined in this Complaint have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

DATED: April 3, 2008

_Susan G. Kupfer_

Susan G. Kupfer (Bar No. 141724)
Kathleen S. Rogers (Bar No. 122853)
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Telephone: (415) 972-8160
Facsimile: (415) 972-8166
skupfer@glancylaw.com
krogers@glancylaw.com

*Attorneys for Plaintiff and the Proposed Classes*

## JURY DEMAND

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

1 | DATED: April 3, 2008

2

3 |                                         Susan G. Kupfer (Bar No. 141724)
                                            Kathleen S. Rogers (Bar No. 122853)
4 |                                         GLANCY BINKOW & GOLDBERG LLP
                                            One Embarcadero Center, Suite 760
5 |                                         San Francisco, CA 94111
                                            Telephone: (415) 972-8160
6 |                                         Facsimile:  (415) 972-8166
                                            skupfer@glancylaw.com
7 |                                         krogers@glancylaw.com

8 |                                         *Attorneys for Plaintiff and the Proposed Class*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLASS ACTION COMPLAINT

JS 44  - CAND (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

## I.(a) PLAINTIFFS
DANA ROSS, Individually and On Behalf of All Others Similarly Situated,

## DEFENDANTS
CHUNGHWA PICTURE TUBES, LTD., et al

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Ventura County, California

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Susan Kupfer, Glancy Binkow & Goldberg LLP, One Embarcadero
Center Suite 760, San Francisco, CA, 94111.  Tel: (415) 972-8160

ATTORNEYS (IF KNOWN)

E-filing

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☑ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in
Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF
AND ONE BOX FOR DEFENDANT)
(For diversity cases only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☑ Original
Proceeding

☐ Removed from
State Court

☐ Remanded from
Appellate Court

☐ Reinstated or
Reopened

☐ Transferred from
Another district
(specify)

☐ Multidistrict
Litigation

☐ Appeal to District
Judge from Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☑ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure of | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury | Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 RR & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers | Injury Product Liability | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability | | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 850 Securities/Commodities/ |
| Student Loans (Excl | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| Veterans) | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | Property Damage | | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders Suits | Product Liability | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate | ☐ 791 Empl.Ret. Inc. Security Act | | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence Habeas Corpus: | | ☐ 870 Taxes (US Plaintiff or | Determination Under |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing | ☐ 530 General | | Defendant | Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | 26 USC 7609 | Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/ disab - Empl | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | ☐ 446 Amer w/ disab - Other | ☐ 555 Prison Condition | | | |
| | ☐ 480 Consumer Credit | | | | |
| | ☐ 490 Cable/Satellite TV | | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26) and Section 1 of the Sherman Antitrust Act (15 U.S.C. §1)

## VII. REQUESTED IN COMPLAINT: ☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $_____ CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ YES ☐ NO

## VIII. RELATED CASE(S)
IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

MDL 1917, In Re Cathode Ray Tubes
Antitrust Litigation, N.D. CA 07-cv-05944-SC

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☑ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE 4.3.08    SIGNATURE OF ATTORNEY OF RECORD    Susan Kupfer